# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* HUMPHRIES, Minors.

UNPUBLISHED
November 13, 2018

No. 342231
Wayne Circuit Court
Family Division
LC No. 15-519449-NA

*In re* HUMPHRIES/DIXON, Minors.

No. 342232
Wayne Circuit Court
Family Division
LC No. 15-519449-NA

Before: MURRAY, C.J., and METER and GLEICHER, JJ.

PER CURIAM.

In these consolidated matters, the circuit court terminated the parental rights of respondent-mother Tamika Dixon to her three youngest children and of the children's fathers, respondent-father Keon Humphries and non-appellant Shawntel Jenkins. Respondents did not overcome the barriers to reunification. We affirm.

## I. BACKGROUND

Dixon is no stranger to the child protective system. As a teenager, Dixon was a "delinquent ward." She gave birth to her first child at 17, her second at 18, and third at 20. Although she had supportive services, Dixon ultimately placed her first three children in guardianships. Dixon became romantically involved with Humphries and had two children—KLH (born August 16, 2012) and KKH (born April 20, 2014). The state continued to intervene in Dixon's family to ensure the children's safety. In 2013, Humphries was convicted of violent crimes and has been imprisoned ever since, leaving Dixon to raise the children alone (but with continued supportive services).

In 2015, Child Protective Services (CPS) took KLH and KKH into care. Dixon was living in a motel and sharing the sole bed with her boyfriend and the children. Dixon did not have diapers or sufficient formula. She had not followed through with medical treatment for nine-month-old KKH, who suffered from painful bowel maladies, and waited several days to seek treatment when she thought the baby broke his nose. On another occasion, Dixon left an ill

-1-

KLH at the hospital with Humphries's former foster mother, Judy Mock. The Department of Health and Human Services (DHHS) stepped up services in an attempt to keep the children in Dixon's care. However, she repeatedly came to meetings and services without childcare supplies, leaving the children to sit in wet and soiled clothing. At a March 31 family team meeting, Dixon placed young KKH on the floor, stated "I'll see you when you turn 18," and left. The next day, Dixon reported that she was living in her car. The DHHS removed the children from Dixon's care and placed them with Mock, with whom the children already stayed part-time.

The DHHS provided reunification services to Dixon for nearly three years. During this time, Dixon became romantically involved with Humphries's foster brother, Jenkins, and gave birth to Jenkins' child, KD.[1] KD was placed with Mock as well. Dixon was employed, but lacked suitable housing, which was the DHHS's initial concern. As time passed, however, the DHHS's focus shifted to Dixon's anger management problems. She threatened to kill Mock, flew into rages at the foster care workers, and lashed out at the children. Dixon's participation in parenting time was inconsistent. Dixon did not attend visits if she was not in the mood, and usually sat back and let the children play without interacting with them. She retaliated against the children, cancelling subsequent visits when Mock had to cancel sessions because the children were sick, and telling the children that Mock did not love them. Although Dixon completed parenting classes and therapy, she did not show benefit. And Dixon declined more intensive services, such as a parent partner.

Humphries remained in prison throughout these proceedings and therefore had limited ability to participate in services. Due to continuing behavior problems, Humphries had been denied parole multiple times and could potentially remain imprisoned until 2029. However, Humphries regularly and appropriately communicated with KLH and KKH via telephone and Mock had brought the children to visit him in prison.

Ultimately, the circuit court terminated Dixon's and Humphries's parental rights on several grounds. They now appeal.

## II. STATUTORY GROUNDS

Both respondents challenge the evidentiary support for the statutory grounds underlying the circuit court's termination of their parental rights. Pursuant to MCL 712A.19b(3), a circuit court "may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence" that at least one statutory ground has been proven by the DHHS. MCR 3.977(A)(3); *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000). When termination is sought in a supplemental petition based on new grounds, the DHHS must present legally admissible evidence in support. *In re DMK*, 289 Mich App 246, 258; 796 NW2d 129 (2010). We review for clear error a circuit court's factual finding that a statutory termination ground has been established. *In re Rood*, 483 Mich 73, 90-91; 763 NW2d 587 (2009). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has

---

[1] Jenkins expressed no desire to parent KD, did not participate in services, and did not challenge the court's termination decision.

been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (quotation marks and citation omitted). "Clear error signifies a decision that strikes us as more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

The circuit court terminated Dixon's parental rights based on MCL 712A.19b(3)(c)(*i*) and (*ii*), and (g), which provided:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> * * *

> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[2]

In addition to the above factors, the court also relied on factors (a)(*ii*), (h), and (k)(*i*) in terminating Humphries's rights:

> (a) The child has been deserted under any either of the following circumstances:

---

[2] The Legislature has since revised MCL 712A.19b(3)(g) to read:

> The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age. [See 2018 PA 58, effective June 12, 2018.]

* * *

(*ii*) The child's parent has deserted the child for 91 or more days and has not sought custody of the child during that period.

* * *

(h) The parent is imprisoned for such a period that the child will be deprived of a normal home for a period exceeding 2 years, and the parent has not provided for the child's proper care and custody, and there is no reasonable expectation that parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(k) The parent abused the child or a sibling of the child and the abuse included 1 or more of the following:[3]

(*i*) Abandonment of a young child.

## A. RESPONDENT-FATHER

The court did not err in finding statutory grounds to terminate Humphries's parental rights. The main factor underlying the court's determination under all the statutory grounds was Humphries's incarceration. According to the Michigan Offender Tracking Information Service, Humphries was convicted in 2013 of assault with intent to do great bodily harm less than murder and unlawful imprisonment. His earliest release date of April 12, 2016, has come and gone. At the time of the termination hearing, Humphries had been denied parole three times based on his poor disciplinary performance in prison. Although Humphries attended service-related classes in prison, "he never showed a convincing acceptance of his accountability for his actions" and appeared not to take the sessions seriously. Ultimately, Humphries's chance of release in the near future did not look promising, and he could remain in prison until his maximum release date of February 9, 2029.

Humphries had been incarcerated since KLH was a baby and before KKH was born. He had not provided financially or physically for KLH since 2013, and had never provided care for KKH. Indeed, he did not even establish paternity of KKH until these proceedings. Through his poor performance in prison services, Humphries demonstrated that he would be unable to provide any type of care or custody for the children within a reasonable time. He had gained no job skills and had not benefited from parenting classes and counseling. Although the children were placed with Humphries's former foster mother, Humphries did not advocate for that

---

[3] 2018 PA 58 also revised the introductory paragraph to factor (k) to read: "The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent[.]"

placement and played no part in securing alternate care for his children while he was incarcerated. Compare *In re Mason*, 486 Mich 142, 161, n 11; 782 NW2d 747 (2010). And due to his inability to qualify for parole, KLH and KKH would be deprived of a home life with Humphries for more than two years into the future. Even if Humphries were paroled, he had no plan to take custody of his children. He testified that he hoped only for supervised visitation, which would leave the children still without a permanent home.

Because Humphries had never provided proper care and custody for the children and likely would not be able to provide for his children anytime in the foreseeable future, the evidence supported termination of his parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (h). The DHHS provided no evidence of new conditions to support termination under factor (c)(*ii*), and we decline to consider whether Humphries abandoned his children as required for termination under factors (a)(*i*) and (k)(*i*). In any event, the court need only support termination with one statutory factor. MCL 712A.19b(3). Accordingly, Humphries is not entitled to relief.

## B. RESPONDENT-MOTHER

Dixon complains not only that the evidence was insufficient to establish the statutory grounds for termination, but also that the DHHS failed to provide reasonable services to her in light of her cognitive impairment.

Absent certain extenuating circumstances, the DHHS "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017); *Mason*, 486 Mich at 152. This includes providing services geared toward reunification through a case service plan. *Id*. at 85-86. To comply with the Americans with Disabilities Act, the DHHS must make reasonable modifications to services to accommodate a parent's special needs. The absence of accommodation precludes a finding that reasonable efforts were made. *Id*. at 86. Here, we find no error on the DHHS's part.

The DHHS referred Dixon for both a psychological and a psychiatric evaluation. Tests conducted during the evaluations revealed that Dixon was within the borderline range of intellectual functioning overall. Neither evaluator classified Dixon as suffering from a disability under the ADA. Indeed, both opined that Dixon could improve her parenting skills and chance of success through parenting classes, therapy, and other services. And Dixon demonstrated her effectiveness by maintaining full-time employment throughout these proceedings. Moreover, the DHHS provided Dixon a bevy of services. Dixon participated in counseling directed at addressing her domestic violence and aggression issues. She attended parenting classes. When Dixon failed to show sufficient progress, the DHHS offered to appoint a parent partner to more closely guide her through services and in resolving barriers to reunification. Dixon refused this service. On this record, it appears that the DHHS was not remiss in its duties.

In any event, Dixon participated in and completed services, but did not demonstrate sufficient benefit. See *In re Gazella*, 264 Mich App 668, 676; 692 NW2d 708 (2005). For example, Dixon exhibited difficulty interacting with her children. She started the proceedings with unsupervised parenting time, but eventually lost that right. Despite completing parenting classes, her interactions with the children did not improve. At the onset of the case, Dixon

became frustrated at a family team meeting, placed 10-month-old KKH on the floor, and stated, "I'll see you when you turn 18." As the proceedings progressed, Dixon did not interact with the children during parenting time, simply sitting back and using her phone or watching the children play. The children would escape the room to look for Mock and the caseworkers would have to redirect Dixon to attend to their needs. Dixon was often negative with the children and told them that Mock did not love them, or described the children as "hard-headed, disrespectful, they're not being raised right." This caused KLH to regress; she started acting aggressively toward other children and the caseworker and had difficulty sleeping. Dixon texted the caseworker "on several occasions," making statements such as "F my kids, I don't want to see them today. If I never see them again, I have three other kids in a guardianship I can visit when I want to." "[A]ttending parenting classes, but learning nothing from them and, therefore, not changing one's harmful parenting behaviors, is of no benefit to the parent or child." *Id*.

Dixon did not demonstrate benefit from counseling geared toward anger management, either. Mock tried to assist not only the children, but also Dixon. While Dixon was still permitted unsupervised parenting time, Mock allowed Dixon to move into her home. Dixon did not clean up after herself and caused other problems, leading Mock to evict her. Dixon responded with verbal threats and by "egging" Mock's home. Dixon "lashed out" and threated to kill or harm Mock on more than one occasion. She also threatened the caseworker.

To Dixon's credit, she did secure suitable housing by the time of the termination hearing. However, this was only one barrier to reunification. Ultimately, the DHHS provided more than sufficient admissible evidence to establish that conditions arising after adjudication, such as Dixon's anger management issues, had not abated. As Dixon had been receiving services off and on since 2008, and received nearly three years of services during this proceeding, the court did not clearly err in concluding that Dixon could not rectify those conditions and provide proper care and custody for her children within a reasonable time. Accordingly, termination was supportable on the cited grounds.

## III. BEST INTERESTS

Respondents also contend that termination of their parental rights was not in their children's best interests. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *Moss*, 301 Mich App at 90. The court should weigh all the evidence available to it in determining the child's best interests. *Trejo*, 462 Mich at 356-357. Relevant factors include "the child's bond to the parent, the parent's parenting ability, [and] the child's need for permanency, stability, and finality. . . ." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider . . . the parent's compliance with his or her case service plan, the parent's visitation history with the child, [and] the children's well-being while in care. . . ." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). The advantages of the child's foster placement over placement with the parent are a relevant consideration. *In re Foster*, 285 Mich App 630, 634-635; 776 NW2d 415 (2009). However, a child's placement with relatives weighs against termination, MCL 712A.19a(6)(a), and the court

must expressly consider the child's relative placement in making its best-interest determination. *Olive/Metts*, 297 Mich App at 43.

Humphries's relationship with his children was very limited due to his incarceration; he spoke to them on the phone and enjoyed a handful of prison visits. He was completely unable to participate in the services actually required in his case service plan and gained little benefit from those prison services he did participate in. Humphries had no plan for employment or housing upon his release and has conceded that he will not be able to provide for his children; indeed, he hoped for supervised parenting time. It is possible that he will remain in prison until 2029, when KLH will be 17 and KKH 15.

Ultimately, KKH and KLH may be able to visit their father a couple of times each year in prison. However, the children needed permanency, finality, and stability, which Humphries could not provide. Mock was willing to adopt the children, giving them a stable and permanent home. At this stage in the proceedings, the children's interest in a normal family home is superior to any interest that the parent may have had. *Moss*, 301 Mich App at 88.

Similarly, KLH and KKH waited nearly three years while Dixon participated in services with no benefit, and KD waited her entire life. Dixon actually regressed, losing unsupervised parenting time. Even as the proceedings came to a close, Dixon continued to make harmful comments to the children, impacting their emotional well-being. Under these circumstances, we cannot conclude that the circuit court's decision was counter to the children's best interests.

We affirm.

/s/ Christopher M. Murray
/s/ Patrick M. Meter
/s/ Elizabeth L. Gleicher